UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| NORMA TOMLINSON, | ) | |
| (Social Security No. XXX-XX-7520), | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:07-cv-68-RLY-WGH |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION**

Norma Tomlinson ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") that she is not entitled to

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act").  42 U.S.C. §§ 1381(a), 1382(c); 20 C.F.R. § 404.1520(f).  The court has

jurisdiction pursuant to 42 U.S.C. § 1383(c)(3).

Plaintiff filed her current[1] application for benefits on February 20, 2003, alleging

disability since January 1, 2000,[2] due to migraine headaches, diabetes, low back pain,

---

[1] Plaintiff has filed two prior applications for SSI benefits, both of which were denied on Initial Consideration by the Indiana State Agency.  (R. 79, 30-35).  These decisions were not appealed by Plaintiff, and are, therefore, *res judicata* pursuant to 20 C.F.R. § 416.1457.  As those prior applications are not before the court, the court will only consider medical evidence submitted after February 6, 2002, the day following Plaintiff's second denial of benefits.

[2] Although Plaintiff asserts that she has been disabled since January 1, 2000, the earliest that a claimant can be eligible for SSI benefits is the month following the month in which the application is filed.  20 C.F.R. §§ 416.202, 416.501.  Accordingly, if found disabled, Plaintiff's eligibility for benefits would begin on March 20, 2003.

asthma, and anxiety.  (R. 65-68, 106).  Her application was denied initially and on

reconsideration.  (R. 36-43).  She requested a hearing, and on September 21, 2004,

Plaintiff, represented by an attorney, appeared and testified before Administrative Law

Judge ("ALJ") Marsha Stroup.  (R. 494-532).  A vocational expert, Lisa A. Courtney

("VE"), also testified.  (R. 494).  On March 18, 2005, the ALJ determined that Plaintiff

was not disabled because she retained the residual functional capacity ("RFC") to perform

a significant number of jobs existing in the regional economy.  (R. 16-26).

On March 30, 2005, Plaintiff submitted additional evidence to the Appeals Council

and requested review of the ALJ's decision.  (R. 11-12).  The Appeals Council denied

Plaintiff's request for further review, making the ALJ's decision the final decision of the

Commissioner.  (R. 5-7).  Thereafter, Plaintiff filed suit in this court pursuant to 42

U.S.C. § 405(g).

## I.     Facts

### A.     Vocational Profile

Plaintiff was born on November 14, 1964, and was 41 years old at the time of the

ALJ's decision.  (R. 17).  She left high school after the eleventh grade, but later obtained

her General Equivalency Diploma.  (R. 90).  Plaintiff also completed special training to

become a certified nursing assistant ("CNA").  (R. 90, 502).  In addition to working as a

CNA, Plaintiff has past work experience as a housekeeper.  (R. 23).

### B.     Medical History

In addition to the specific medical treatments described below, Plaintiff has been

2

regularly treated for all of her ailments by her primary physician, Alan Hall, M.D. ("Dr. Hall"). (*See* R. 334-65).

### 1.      Asthma/Shortness of Breath

On December 16, 2002, Plaintiff was admitted to Deaconess Hospital ("Deaconess") due to chronic obstructive pulmonary disease ("COPD") exacerbation with asthma exacerbation and was treated by Delia Quisenberry, M.D. ("Dr. Quisenberry"). (R. 317). Dr. Quisenberry noted that Plaintiff "has a known history of noncompliance with medical therapy and her home medication." (*Id.*). Resumption of Plaintiff's home medications, along with IV Solu-Medrol and nebulizer treatments, were met with good results. (R. 318). Plaintiff was counseled at length to stop tobacco use, however, she continued to smoke while hospitalized. (*Id.*). Plaintiff left Deaconess on December 22, 2002, against medical advice. (*Id.*).

On March 3, 2003, Plaintiff was treated at the Deaconess emergency room for COPD exacerbation. (R. 388). Chest x-rays showed no evidence of acute infiltrate, effusion, or pneumothorax. (R. 389). The treating physician noted that Plaintiff reported continuing to smoke a pack of cigarettes a day. (R. 387).

On May 18, 2004, Plaintiff was treated at the Deaconess emergency room for symptoms of asthmatic bronchitis and chest wall strain and pain. (R. 438). Plaintiff reported that she does smoke. (R. 437).

Plaintiff testified at the hearing before the ALJ that she uses a breathing nebulizer three times a day and an Albuterol inhaler as needed. (R. 516-17). She also testified that

if she walks a very far distance, she gets short of breath and has to sit or lay down.  (R. 512).  Plaintiff reported that she does not smoke.  (R.501).

### 2. Migraine Headaches

Plaintiff has a long history of headaches.  (*See, e.g.*, R. 259, 263, 283, 299, 302, 310).   However, the headaches are often diagnosed as a symptom of another ailment, rather than a migraine.  (R. 299 ("I think her symptoms probably are more related to the Bactrim antibiotic that she is on for urinary tract infection."), 312 ("Headache . . . most likely represents viral type syndrome."), 283 ("She says she gets this way when her sugar is high.")).

On September 7, 2002, Plaintiff was treated at the Deaconess emergency room for a migraine headache.  (R. 264).  Plaintiff reported some blurred vision.  (R. 264).  She was given Nubain and Phenergan, which resolved the headache.  (R. 264).

On October 10, 2002, Plaintiff was treated at the Deaconess emergency room for a migraine headache.  She reported that the headache was frontal in nature and was aggravated by bright lights.  Plaintiff also reported that the headache also caused nausea and vomiting, which is typical for the migraines that she usually suffers from.  (R.254-55).

On December 12, 2002, Plaintiff was treated at the Deaconess emergency room for a migraine headache.  (R. 308).  Plaintiff reported some blurry vision.  (*Id.*).  She responded well to pain medications.  (*Id.*).

On February 3, 2003, Plaintiff was treated at the Deaconess emergency room for a migraine, accompanied by nausea and photophobia.  The treating physician noted that she did have some tenderness of the right temple.  (R. 398).

### 3.      Diabetes

Plaintiff has been treated multiple times for high blood sugar and the accompanying symptoms.  On March 2, 2002, Plaintiff's blood sugar was 358.  (R. 302-03).  On July 31, 2002, Plaintiff reported blood sugar near 400 and was instructed to see Dr. Hall for better control of her diabetes.  (R. 273-74).  On September 27, 2002, her blood sugar was 358.  (R. 259-60).  On October 1, 2002, her blood sugar was 460.  (R. 252).  On each occasion, Plaintiff was given IV fluids and medication to lower her blood sugar to within normal limits.

On December 12, 2002, Plaintiff was admitted to Deaconess for out of control diabetes.  (R. 308).  During her three day hospitalization, Plaintiff was noncompliant with staff directives.  (*Id.*).  After a long speech from the treating physician concerning proper diet and how to treat her diabetes, Plaintiff was seen eating ice cream, despite orders not to.  (*Id.*).  Plaintiff was discharged after the treating physician determined that Plaintiff's diabetes was under enough control to be followed on an outpatient basis.  (*Id.*).

Plaintiff testified that she takes medication daily to control her diabetes.  (R. 504).  She also tests her blood sugar frequently.  (*Id.*).

### 4.      Low Back Pain

Plaintiff has been treated multiple times for low back pain.  On July 14, 2002,

Plaintiff was treated at the Deaconess emergency room for a variety of symptoms, including low back pain. (R. 283). Plaintiff reported that the pain was moderate to severe. (*Id.*). The treating physician noted that there was some tenderness over the lumbosacral area. (*Id.*).

On July 16, 2002, Plaintiff presented at the Deaconess emergency room complaining of low back pain, which was worse with movement. (R. 278). Plaintiff was treated with an injection of Demerol and Phenergan IM. (R. 279). The treating physician also wrote Plaintiff a prescription for a 4-prong cane to use due to her back pain. (*Id.*).

On February 21, 2003, Plaintiff was seen by Karen Staples, M.P.T. (R. 332). Plaintiff reported constant pain along her entire right lumbar and lower thoracic spine. (*Id.*). The therapist noted abnormalities in Plaintiff's flexibility screening, palpatation, ROM screening, and strength. (R. 333).

On April 4, 2003, Plaintiff received an MRI to examine her complaint of chronic low back pain with right leg pain and numbness. The radiologist found that Plaintiff's vertebral body height and alignment were normal and all discs were normally hydrated. No disc herniations were identified and there was no canal stenosis or neural foraminal narrowing. The radiologist's impression was "normal." (R. 362).

On June 23, 2003, Plaintiff was treated by James E. Gorvis, M.D. ("Dr. Goris") for low back pain. Dr. Gorvis' examination revealed that Plaintiff was tender to palpitation over the low back, but was able to bend forward and touch her toes. The straight leg raise was negative. Dr. Gorvis noted that Plaintiff's MRI was essentially normal. Following

6

his examination of Plaintiff and her MRI, Dr. Gorvis found that there was no treatment which he could add.  He recommended anti-inflammatories for pain management and cautioned Plaintiff to be very judicious in her use of injections through the emergency room.  Dr. Gorvis discussed the possibility of weight loss with Plaintiff, which he felt would be the most likely thing to help her back.  (R. 374).

Plaintiff testified that she has been on pain medications, such as Lortabs and Vicodine, and muscle relaxers, such as Zanaflex, for her back pain.  (R. 510-11).  Plaintiff also testified that she wears a back brace.  (R. 510).

### 5.      Anxiety and Depression

Plaintiff was treated at the Deaconess emergency room on May 25, 2002, for anxiety, depression, and mild suicidal ideation.  Plaintiff reported that she had an argument with her boyfriend, which caused worsening depression and anxiety.  She also reported that she had had some suicidal thoughts, but had not acted on anything in particular.  (R. 291).

On September 29, 2003, Plaintiff was brought to the Deaconess emergency room by ambulance for evaluation of several complaints, including anxiety symptoms.  (R. 465).  Plaintiff was given a prescription for Limbitrol for her anxiety related symptoms and instructed to follow-up with Dr. Hall.  (R. 466).

On October 9, 2003, Plaintiff reported to Dr. Hall that she had had an anxiety attack.  Plaintiff also stated that she was having a hard time sleeping.  (R. 423).

7

### 6.      Obesity

Plaintiff's medical records from Dr. Hall indicate that she is obese.  From May 21,

2003, to June 10, 2004, Plaintiff's weight ranged from 240 to 285 pounds.  (*See* R. 334-

65).  At the hearing before the ALJ, Plaintiff testified that she was 5' 2" and weighed 240

pounds.  (R. 500).

### 7.      Hypertension

Plaintiff's medical records from Dr. Hall indicate that she suffers from

hypertension.  (*See* R. 334-65).  The hypertension is also mentioned in the documentation

surrounding Plaintiff's many emergency room visits.  Plaintiff testified that she is on

blood pressure medication, but that her blood pressure still remains high most of the time.

(R. 513).  Plaintiff further testified that when her blood pressure is high, she gets a

headache and feels dizzy.  (R. 513-14).

### C.      Medical Evaluations

### 1.      Dr. Sands

At the request of the state agency,  J. Sands, M.D. ("Dr. Sands") reviewed the

evidence of record and on June 23, 2002, offered an opinion concerning Plaintiff's

physical residual functional capacity.  (R. 155).  Dr. Sands determined that Plaintiff could

occasionally lift and/or carry 20 pounds and ten pounds frequently; stand and/or walk

about six hours in an eight-hour workday; sit about six hours in an eight-hour workday;

and was not limited in her ability to push and/or pull with her extremities.  (R. 156).  Dr.

Sands also opined that Plaintiff could occasionally climb ramps and stairs; stoop; kneel;

and crouch, but she should never climb ladders, ropes, and scaffolds; balance; and crawl. (R. 157). In addition, Dr. Sands stated that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, as well as slippery or uneven surfaces. (R. 159).

### 2.    Dr. Gray

On May 27, 2003, Jeffrey W. Gray, Ph.D. ("Dr. Gray") conducted a mental status evaluation of Plaintiff at the request of the state agency. (R. 366-70). Dr. Gray described Plaintiff's affect as "perhaps very slightly flat and remained stable." (R. 366). He noted that Plaintiff was able to comprehend procedural instruction but did require some slight repetition at times. (R. 367). Dr. Gray stated that results of a mental status examination indicated an estimated general intellectual ability in the lower end of the low average borderline range. (*Id.*). He added, "there were actually no clear signs in these data that depression or anxiety significantly affected these findings." (*Id.*).

Dr. Gray suggested that Plaintiff's nonverbal abilities were more prominent than her verbal skills. He opined that Plaintiff would have a difficult time with highly complex and perhaps some detailed types of tasks, but she could "do simple repetitive types of tasks particularly if such tasks were only one to two to three step[s] in nature, do not require stringent speed or quota component, and do not require frequent shifts." He added that Plaintiff continued to have the gross psychological abilities to handle work-like stresses, and to be fairly reliable and independent. In addition, he opined that Plaintiff had at least a mild degree of difficulty consistently relating to co-workers and

interacting with supervisors.  Dr. Gray noted that Plaintiff does have the ability to handle her own business affairs and manage her own funds.  (R. 369).

Dr. Gray's final impressions of Plaintiff were as follows: "adjustment disorder with depressed and to some extent anxious mood; probable panic disorder without agoraphobia; rule out borderline intellectual functioning with more salient nonverbal than verbal abilities."  (R. 369-70).  Dr. Gray also assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 60.  (R. 370).

### 3.    Dr. Galen

Plaintiff was evaluated by Michelle Galen, M.D. ("Dr. Galen") on May 31, 2003, at the request of the state agency.  Dr. Galen's impressions were that the Plaintiff suffers from migraine headaches, diabetes requiring insulin, chronic lumbar pain, and anxiety.  It appeared to Dr. Galen that Plaintiff's complaints severely affect her activities of daily living.  Dr. Galen indicated that Plaintiff is unable to lift/carry no more than 10 pounds for a short time and cannot sit/walk for more than 30 minutes continuously.  (R. 371-72).

### 4.    Dr. Pressner

On June 11, 2003, J. Pressner, Ph.D., ("Dr. Pressner") completed a psychiatric review of the evidence of record at the request of the state agency.  Dr. Pressner determined that Plaintiff did not have a mental impairment that could be considered severe under the Agency's regulations.  (R. 29, 141).  He stated that Plaintiff had only a mild degree of limitation in the functional area of "Restriction of Activities of Daily Living."  (R. 151).  Dr. Pressner also opined that Plaintiff had no limitations in the

10

functional areas of "Difficulties in Maintaining Social Functioning" and "Difficulties in Maintaining Concentration, Persistence, or Pace." (*Id.*). He indicated that weight was given to Dr. Gray's opinion that Plaintiff could perform simple tasks and could relate adequately. (R. 153).

### 5.   Dr. Corcoran

On October 31, 2003, J. Corcoran, M.D. ("Dr. Corcoran"), also a state agency physician, reviewed the evidence of record and concurred with Dr. Sands' June 23, 2002, opinion. (R. 162).

### D.   Vocational Expert Testimony

The VE testified that Plaintiff's past employment as a CNA, in terms of exertion and skill level, was medium and semi-skilled in nature, while her employment as a housekeeper was light and unskilled. (R. 525). The ALJ asked the VE whether jobs exist in the national economy for an individual of the Plaintiff's age, education, past relevant work experience, and residual functional capacity as determined. The VE replied that such an individual could work as a packer, inspector, assembler, or cashier. The VE further testified that there are 800 packer jobs, 800 inspector jobs, 1,000 assembler jobs, and 7,000 cashier jobs in Indiana, a significant number of which are in the regional economy where Plaintiff resides. (R. 526-28).

The ALJ also questioned the VE on the kind of absenteeism that would be permitted at these kinds of jobs. (R. 528). The VE replied that generally three absences a month would be allowed, but that this did not mean that the employee could miss work

11

three times every month.  (*Id.*).  The VE also testified that Plaintiff would not be allowed to take unscheduled breaks on an ongoing basis, even if it were for medical reasons, such as taking insulin.  (R. 529-530).

## II.     Standard of Review

When the Appeals Council denies review, as it did in Plaintiff's case, the ALJ's decision constitutes the final decision of the Commissioner.  20 C.F.R. § 416.1481; *see also Scott v. Barnhart*, 297 F.3d 589, 593 n. 4 (7th Cir. 2002).   An ALJ's decision will be upheld "if it is reached under the correct legal standard and if it is supported by substantial evidence."  *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000) (*citing Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992)).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

This standard of review recognizes that it is the ALJ's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  While the court must examine the entire record, it cannot re-weigh the evidence or substitute its own judgment for that of the ALJ. *Schmidt*, 201 F.3d at 972.  Thus, even if reasonable minds could differ as to whether Plaintiff is disabled, the court must affirm the ALJ's decision denying benefits.  *Id.*

## III.     Standard for Disability

In order to establish that she suffers from a disability, and is therefore qualified to

12

receive disability benefits under the Act, Plaintiff must establish that she is unable to engage in any substantial gainful activity because of "a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set forth a sequential five-step test that the ALJ is to utilize in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently [un]employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (*citing Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).

"An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (*quoting Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985)). At steps one through four, the burden of proof is on the claimant; at step five the burden shifts to the Commissioner. *Clifford*, 227 F.3d 863 at 868 (*citing Knight*, 55 F.3d at 313).

### IV.    The ALJ's Decision

On March 18, 2005, the ALJ issued a written decision finding that Plaintiff did not

13

have a disability within the meaning of the Act.  (R. 26).  While the ALJ found that

Plaintiff's asthma, migraine headaches, low back pain, diabetes, hypertension, anxiety,

depression, and obesity were severe impairments, the ALJ concluded that the severe

impairments did not meet or substantially equal any of the impairments in 20 C.F.R. §

404, Subpart P, Appendix 1.  (R. 25).  The ALJ also found that Plaintiff's allegations

regarding her assertions of disabling pain and limitations of function were not fully

credible.  (*Id.*).  She therefore concluded that Plaintiff retained the RFC to perform a

significant range of sedentary work.[3]  (*Id.*).

Based on the RFC rating, the ALJ found that Plaintiff was unable to perform any

of her past relevant work.  (R. 25).  However, based on the Medical-Vocational

guidelines, specifically rule 201.28, in conjunction with vocational expert testimony, the

ALJ found that Plaintiff could perform a significant number of jobs in the national

economy, and was therefore not disabled under the Act.  (R. 26).  Specifically, the ALJ

found that Plaintiff could work as a packer, inspector, assembler, and cashier.  (*Id.*).

## V.      Issues on Appeal

Plaintiff raises six issues on appeal.  Plaintiff argues that (1) she meets the

requirements for mental retardation under listing 12.05; (2) the ALJ failed to develop the

record and order tests as required; (3) the ALJ failed to cite any evidence in support of the

---

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. § 416.967(a).

RFC assigned to Plaintiff; (4) the RFC does not include limitations from all of the impairments that the ALJ found severe; (5) the ALJ failed to evaluate Plaintiff's obesity as contemplated in SSR 02-1p; and (6) the ALJ failed to properly evaluate Plaintiff's credibility.

**A.      Whether the ALJ improperly failed to consider whether Plaintiff meets the requirements for mental retardation**.

Plaintiff argues the ALJ failed to recognize that Plaintiff meets the requirements under Section 12.05 of 20 C.F.R. § 404, Subpart P, Appendix 1 for mental retardation. However, Plaintiff did not allege that she was disabled due to mental retardation in her hearing before the ALJ.  In fact, the medical report which Plaintiff claims establishes her mental retardation was submitted to the Appeals Council as additional evidence, and was not before the ALJ when she was rendering her decision.  The ALJ's failure to consider whether Plaintiff was mentally retarded was not improper because Plaintiff did not place any evidence of mental retardation before the ALJ.

A district court may not reverse the decision of an ALJ on the basis of evidence first submitted to the Appeals Council.  *Eads v. Sec'y of Dept. Of Health and Human Serv.*, 983 F.2d 815, 818 (7th Cir. 1993).  However, 42 U.S.C. § 405(g) ("Sentence Six") provides that the court may remand the case if the plaintiff shows that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  "For Sentence Six purposes . . . 'materiality' means that there is a 'reasonable probability' that the

Commissioner would have reached a different conclusion had the evidence been considered, and 'new' means evidence 'not in existence or available to the claimant at the time of the administrative proceeding.'  *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (*quoting Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).

In the instant case, Plaintiff has not met her burden under Sentence Six.  She has not shown that the medical report concerning mental retardation is new and material, nor has she given any reason why this evidence was not presented to the ALJ at the March 18, 2005, hearing.  Accordingly, the court will not remand for consideration of the additional evidence presented to the Appeal Council.

**B.     Whether the ALJ failed to develop the record and order tests as required.**

Plaintiff argues that the ALJ failed to develop a full and fair record.  Specifically, the Plaintiff alleges that the ALJ should have ordered I.Q. testing of the Plaintiff.  Plaintiff also seems to indicate that she believes that the ALJ should have considered whether she had an impairment under Listing 12.05 (mental retardation).  Plaintiff argues that because of the ALJ's failure to develop a full and fair record, the court should remand in order for additional evidence to be obtained.

The ALJ does have "a basic obligation to develop a full and fair record."  *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).  However, the Seventh Circuit has noted that it is impossible for an ALJ to create a "complete" record because it is always possible to "obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on."  *Kendrick v. Shalala*,

998 F.2d 455, 456-57 (7th Cir. 1993).  Accordingly, federal courts generally respect the Commissioner's reasoned judgment in determining how much evidence to collect.  *See id.* at 458.  The ALJ does have a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts" when the claimant is unrepresented by counsel.  *Nelson*, 131 F.3d at 1235 (*quoting Smith v. Sec'y of Health Educ. and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)).  In the instant case, however, Plaintiff was represented by counsel.

Plaintiff claims that the ALJ should have ordered IQ testing because one of the Social Security examiners felt that borderline intellectual functioning needed to be ruled out.  After examining the record, the court believes that Plaintiff is referring to a line in Dr. Gray's evaluation, which states, "rule out borderline intellectual functioning with more salient nonverbal than verbal abilities."  (R. 370).  That statement, however, is ambiguous on its face.  The court is not convinced that Dr. Gray was indicating that borderline intellectual functioning needed to be ruled out as a possible diagnosis, especially since Dr. Gray did not recommend any further testing, and was in fact able to render an opinion concerning Plaintiff's mental status.  None of the physicians who examined Plaintiff recommended that she undergo I.Q. testing, nor did Plaintiff (or her attorney) raise her I.Q. as an issue before the ALJ.  Accordingly, the court finds the ALJ did not fail to develop a full and fair record.

Within her argument that the ALJ failed to develop the record and order tests as required, Plaintiff states "it should be noted that Listing 12.05 was not considered nor

evaluated by the ALJ."  (Docket # 14 at 7).  To the extent that Plaintiff is arguing that the ALJ failed to properly develop the record because she did not consider whether Plaintiff was impaired under Listing 12.05, the court rejects Plaintiff's argument.  Plaintiff never alleged, prior to her appeal to the Appeals Council, that she was disabled due to mental retardation, nor did she provide the ALJ with any evidence suggesting that she might be mentally retarded.  In fact, the evidence before the ALJ indicates that Plaintiff was able to complete her GED, was never placed in special education classes while in school, managed her family's finances, and worked as a CNA, which required her to take vital signs and chart.  (R. 105-126).  There was no reason for the ALJ to consider Listing 12.05 in her determination; accordingly, her failure to do so was not an error.

**C.     Whether the ALJ failed to cite any evidence in support of the RFC**

The ALJ determined that Plaintiff retained the RFC to perform sedentary work that involves sitting or standing alternatively at will, occasional bending, twisting, squatting or kneeling in a clean environment with no exposure to extremes of temperature or hazardous conditions, and performing simple work tasks consistent with an SVP of 1-3.  (R. at 23).  Plaintiff argues that this determination was improper because the ALJ did not cite to the opinion of any physician to support the RFC, and seems to imply that a claimant's RFC is a medical determination to be made by a physician.  However, the determination of RFC is an issue reserved to the ALJ.  *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (*citing* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).  While the ALJ is to consider all relevant medical evidence, she should also consider all relevant non-

18

medical evidence in making her determination.  In the instant case, the ALJ's determination as to Plaintiff's RFC was preceded by a lengthy accounting of the medical and non-medical evidence of record.

In light of the medical evidence, the VE's testimony, and Plaintiff's own testimony and work history, the court finds that the ALJ's assessment of Plaintiff's capability to perform a range of sedentary work is supported by substantial evidence.  The physician with the most dire outlook on Plaintiff's capabilities was Dr. Galen.  However, even she indicated that Plaintiff is capable of lifting up to 10 pounds for a short time and sitting or walking for 30 minutes continuously.  Plaintiff herself testified that she is able to walk for one block, stand for 20 to 30 minutes, sit 30-45 minutes, and lift about 10 pounds.  This is entirely consistent with the ALJ's determination that Plaintiff can perform sedentary work that allows her to sit or stand at will.

Plaintiff further argues that the ALJ erred by rejecting evidence that was favorable to her without explanation.  *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1984) ("This court insists that the finder of fact explain why he rejects uncontradicted evidence.").  Plaintiff contends that because the ALJ found that Plaintiff could perform tasks with a SPV of 1-3, she must have disregarded Dr. Gray's opinion that Plaintiff should be limited to tasks that are one to three steps, because many jobs with a SPV of 1-3 arguably involve more than three steps.  However, while Dr. Gray opined that Plaintiff would do particularly well at tasks that were only one to three steps in nature, he did not specifically limit Plaintiff's abilities to tasks of that nature.  Accordingly, the court finds

19

that the ALJ did not reject Dr. Gray's opinion.  In fact, the ALJ discussed Dr. Gray's

evaluation of Plaintiff at great length and limited Plaintiff to "simple works tasks"

because of Dr. Gray's findings.

**D.      Whether the RFC improperly failed to include limitations from all of the impairments that the ALJ found to be severe.**

The Plaintiff specifically argues that Plaintiff's headaches and diabetes were not

properly considered by the ALJ in determining the RFC.  Although Plaintiff's medical

records indicate that there are times when her headaches have caused photophobia and

nausea, there is no evidence to suggest that these occasional headaches have a significant

effect on Plaintiff's activities of daily living.  Furthermore, none of the physicians who

evaluated Plaintiff suggested that her headaches limit her in any significant way.  As for

the diabetes, the record shows that Plaintiff's diabetes is generally controlled by

medication.  Accordingly, Plaintiff should rarely need to take an unscheduled break due

to problems with her blood sugar.  The VE indicated that while unscheduled breaks

would not be permissible on an ongoing basis, Plaintiff could occasionally take an

unscheduled break in the case of an emergency.  The evidence does not reflect the need

for any additional limitations to be included in Plaintiff's RFC due to her headaches or

diabetes; as such, the ALJ did not err by failing to include additional limitations.

**E.      Whether the ALJ failed to properly evaluate Plaintiff's obesity**

Plaintiff argues that while the ALJ found that Plaintiff's obesity was a severe

impairment, she failed to consider the effect of Plaintiff's obesity when formulating her

20

RFC.  Plaintiff correctly points out that the Social Security Ruling 02-1p requires an ALJ to consider the exacerbating effects of a claimant's obesity on her underlying conditions when arriving at a claimant's RFC.  *See* SSR 02-1p, *Clifford v. Apfel*, 227 F.3d 863, 867 (7th Cir. 2000).  However, the failure to explicitly consider the effects of obesity may be harmless error.  *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006).

In the instant case, the ALJ discussed Plaintiff's obesity in great detail, tracking Plaintiff's weight from May 2003 to the date of the hearing, and noting that Plaintiff had recently been losing weight.  (R. at 20).  The ALJ also noted the physicians who included Plaintiff's obesity as part of their evaluations of Plaintiff's health.  Furthermore, the medical evidence shows that Plaintiff's obesity mostly affected her diabetes and back pain, two conditions which the ALJ explicitly addressed when arriving at Plaintiff's RFC.  Thus, although the ALJ did not explicitly consider Plaintiff's obesity when determining RFC, that error was harmless.

**F.**     **Whether the ALJ failed to properly evaluate Plaintiff's credibility**

Finally, Plaintiff challenges the ALJ's determination that Plaintiff's allegations of the intensity, persistence, and functionally limiting effects of her symptoms were not wholly credible.  Because hearing officers are in the best position to see and hear witnesses and assess their forthrightness, their credibility determinations are afforded special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  An ALJ's credibility determination will only be reversed if the claimant can show that it was "patently wrong."  *Id.* (citing *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)).

In the instant case, the ALJ based her credibility determination on a variety of facts and observations.  First, the ALJ found that while Plaintiff's impairments were capable of producing pain and limitations, the medical evidence did not support the extent of pain and limitations to which Plaintiff complained.  Plaintiff's medical records shows that her diabetes is generally under control.  There is no diagnostic evidence to support the presence of neuropathy, her tests are generally normal, and there has been no diagnosis of depression or anxiety.  While an ALJ may not reject a plaintiff's subjective complaints of pain solely because they are not fully supported by medical evidence, the ALJ may consider that as probative of the plaintiff's credibility.  *Powers*, 207 F.3d at 435.

Second, the ALJ noted that Plaintiff's behavior was not entirely consistent with her allegations of severe pain and limitations due to her medical conditions.  For instance, Plaintiff failed to follow prescribed treatment plans, failed to attend doctor's appointments and physical therapy sessions, and continued to smoke against medical advice.  It was reasonable for the ALJ to believe that if Plaintiff's conditions were truly as bad as she said they were, Plaintiff would make more of an effort to follow doctor's orders in an attempt to alleviate some of the pain.  Due to the lack of medical evidence to support Plaintiff's claims and Plaintiff's own inconsistent behavior, the court cannot find that the ALJ's credibility determination was patently wrong.

## VII.    Conclusion

For the foregoing reasons, the court finds that the ALJ's decision in this matter is supported by substantial evidence.  Accordingly, it is **AFFIRMED** as the final decision of the Commissioner.

**SO ORDERED** this 21st day of January 2009.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com